## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 22-cv-2839-WJM-TPO

NORTHMARQ FINANCE, LLC, a Nebraska limited liability company,

     Plaintiff,

v.

FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Florida company,

     Defendant.

---

## ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Plaintiff NorthMarq Finance, LLC's ("NorthMarq") Motion for Partial Summary Judgment (ECF No. 148) ("NorthMarq's Motion") and Defendant Fidelity National Title Insurance Company's ("Fidelity") Motion for Summary Judgment (ECF No. 150) ("Fidelity's Motion") (together, the "Motions"). The Motions have been fully briefed and are ripe for review. (ECF Nos. 158, 160, 174, 175.)

For the following reasons, NorthMarq's Motion is granted in part and denied in part, and Fidelity's Motion is denied.

## I. BACKGROUND[1]

In or around the summer of 2017, NorthMarq agreed to lend over $25 million (the

---

[1] The following factual summary, and the additional pertinent facts set forth in the Court's analysis in Section III *supra,* are based on the parties' briefs on the Motions and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

"Loan") to Ken Caryl Senior Living, LLC ("KCSL") to construct a new senior living community (the "Project") in Littleton, Colorado (the "Property").  (ECF No. 148 at 3 ¶ 1; ECF No. 150 at 3 ¶ 1.)  The Loan was evidenced by a mortgage note (the "Note") (ECF No. 150-1) and secured by a deed of trust encumbering the Property (the "Deed of Trust") (ECF No. 151-2).  (ECF No. 150 at 3 ¶ 2.)  The United States Department of Housing and Urban Development ("HUD") provided mortgage insurance for the Loan under the Federal Housing Administration's ("FHA") Section 232 Program.[2]  (ECF No. 148 at 3 ¶ 2.)

## A.    The Policy

To insure the lien priority of its Deed of Trust, NorthMarq obtained a Loan Policy of Title Insurance from Fidelity (the "Policy").  (*See generally* ECF No. 149-6.)[3]  The Policy is an "ALTA Loan Policy (6/17/06)," a standard form policy promulgated by the American Land Title Association, with certain additional modifications.  (ECF No. 150 at 3 ¶ 3; ECF No. 158 at 3 ¶ 3.)  The Policy generally contains (1) "Covered Risks," numbered 1 through 14; (2) "Exclusions from Coverage"; (3) "Conditions," numbered 1 through 17; (4) a "Schedule A," identifying, among other things, the "Date of Policy" (July 31, 2017), the "Name of Insured" (NorthMarq and HUD) and the "Insured

---

[2] According to HUD's website, "Section 232 is an FHA loan product that provides mortgage insurance for residential care facilities," such as "[n]ursing homes, assisted living facilities, and board and care . . . ."  U.S. Dep't of Housing & Urban Development, *Residential Care Facilities,* https://www.hud.gov/hud-partners/healthcare-programs-orcf (last visited: July 21, 2025) (*see also* ECF No. 148 at 4 ¶ 3 ("HUD provides mortgage insurance to lenders to encourage production of multifamily and senior living facilities, by insuring lenders against loss for a loan default, thereby providing greater access to financing options.")).

[3] Several documents central to this dispute, including the Policy, are appended as exhibits to both parties' Motions.  (*E.g.,* ECF No. 149-6 and ECF No. 151-3.)  In the interest of efficiency, the Court cites to only one of the parties' exhibits where they are otherwise identical.

Mortgage" (the Deed of Trust); and (5) a "Schedule B," containing "Exceptions from

Coverage."  (ECF No. 150 at 3–6 ¶¶ 4–16; ECF No. 158 at 4–5 ¶¶ 4–16; *see generally*

ECF No. 149-6.)  Lastly, attached to the Policy are certain endorsements, including

"ALTA 32.1-06 Construction Loan – Loss of Priority – Direct Payment Endorsement (2-

3-11)" ("ALTA 32.1" or the "Endorsement") and "ALTA 33-06 Disbursement

Endorsement (2-3-11)" ("ALTA 33").  (ECF No. 150 at 4 ¶ 7; ECF No. 149-6 at 34–36.)

The Court reproduces specific language from the Policy where pertinent to its

analysis below.  However, it notes here that Condition 14 of the Policy contains the

following generally applicable merger clause:

> **14.    LIABILITY LIMITED TO THIS POLICY; POLICY
> ENTIRE CONTRACT**
>
> (a)    This policy together with all endorsements, if
> any, attached to it by the Company is the entire policy and
> contract between the Insured and the Company.  In
> interpreting any provision of this policy, this policy shall be
> construed as a whole.

In the same vein, the ALTA 32.1-06 and ALTA 33 each conclude with the following

language:

> This endorsement is issued as part of the policy.  Except as
> it expressly states, it does not (i) modify any of the terms and
> provisions of the policy, (ii) modify any prior endorsements,
> (iii) extend the Date of Policy, or (iv) increase the Amount of
> Insurance.  To the extent a provision of the policy or a
> previous endorsement is inconsistent with an express
> provision of this endorsement, this endorsement controls.
> Otherwise, this endorsement is subject to all of the terms
> and provisions of the policy and of any prior endorsements.

(ECF No. 149-6 at 35; *see also id.* at 8 ¶ 14(d) (incorporating similar language).)

**B.    Disbursement of Loan Funds**

The principal sum of the Loan was not disbursed to KCSL in full at the outset of

the Project.  (*See* ECF No. 159-2 (Building Loan Agreement).)  Rather, in accordance

with the Construction Loan Disbursement Agreement ("Disbursement Agreement")

entered into between NorthMarq, Fidelity, KCSL, and the general contractor for the

Project, Petra Incorporated ("Petra"), NorthMarq periodically "ma[d]e advances of

Construction Funds . . . to [Fidelity], and [Fidelity] . . . disburse[d] such Construction

Funds."  (ECF No. 149-10 at 2 ¶ 2.)

Specifically, the Disbursement Agreement sets forth that KCSL was to submit an

application for an advancement of Loan funds—supported by documentation prepared

by Petra (altogether forming the "Draw")—for NorthMarq's review and approval.  (*Id.* at

3.)  After approval, NorthMarq was to forward the Draw to Fidelity so that it could then

"make a search of the public records and determine that no liens have been filed as of

the date of search ('Search Date')."  (*Id.*)  Then,

> [u]pon receipt of all outstanding payment affidavits and lien
> waivers for all contracts and/or work performed attributable
> to all prior disbursements, [Fidelity] shall issue and deliver to
> [NorthMarq] . . . its endorsement ALTA 32.1 and ALTA 33,
> increasing coverage under the [Policy] as of the Search Date
> to the amount then disbursed and outstanding under the
> loan as provided in the [Policy].

(*Id.*)  After receiving the ALTA endorsements, NorthMarq was to advance sufficient

Loan funds to complete the Draw to Fidelity for actual disbursement.  (*Id.* at 4.)

Notwithstanding that the Disbursement Agreement contemplates the ALTA 32.1

would issue concurrent with each request for disbursement of Loan funds, in practice,

the ALTA 32.1 was issued only one time on the Date of Policy.  (ECF No. 148 at 10 ¶

45; *see also* ECF No. 149-6 at 34.)  Fidelity issued the last ALTA 33, however, on

November 18, 2019.  (ECF No. 149-33.)  It amended the "Date of Coverage" to the

same date and recognized the "aggregate amount" of the Loan then-disbursed was

4

$17,345,524.  (*Id.*)  Of this amount, Fidelity had disbursed $16,827,106 directly to Petra.
(ECF No. 148 at 15 ¶ 69; ECF No. 160 at ¶ 70.)

## C.    The Lien Lawsuits

Eventually, KCSL defaulted on the Loan.  (ECF No. 150 at 7 ¶ 23.)  Between
March and August 2020, the general contractor for the Project, Petra Incorporated
("Petra"), and more than 20 subcontractors recorded mechanic's liens against the
Property.  (ECF No. 148 at ¶ 68; ECF No. 160 at 13 ¶ 68.)[4]  Between June and August
2020, four subcontractors filed lawsuits to foreclose on their respective liens in state
court (the "Lien Suits"), which were eventually consolidated into one action.  (ECF No.
148 at 15 ¶ 73; *see also* ECF Nos. 149-41 through 149-44 (subcontractor's complaints
commencing Lien Suits).)  Each of the subcontractor lien claimants alleged that their
mechanic's lien had priority over the Insured Mortgage.  (ECF No. 148 at 16 ¶ 74.)

Shortly thereafter, NorthMarq tendered a claim to Fidelity for defense of the Lien
Suits and indemnification.  (ECF No. 148 at 16 ¶ 77; ECF No. 160 at 14 ¶ 77; *see also*
ECF No. 149-53 (Sept. 16, 2020 Letter to Fidelity).)  Fidelity denied NorthMarq's claim,
explaining in its corresponding letter that coverage was not available under the
Endorsement because "[t]he Company's investigation has concluded that direct
payments were made directly to Petra at the request of the Insured and no payments
were made directly to any other lien claimant."  (ECF No. 149-54 at 3.)

Roughly a month later, Petra filed its responsive pleadings in the Lien Suits,
asserting counterclaims and cross claims for foreclosure on the Petra Lien (collectively,

---

[4] The Court refers to the lien filed by Petra as the "Petra Lien," all other mechanic's liens
as the "Subcontractor Liens," and collectively as the "Liens."

the "Petra Claims"). (ECF No. 148 at 16 ¶ 75.) Petra similarly alleged that its mechanic's lien was superior to the interest of any other party in the Lien Suits, including NorthMarq's. (*Id.* at 16 ¶ 76.) NorthMarq promptly sent the Petra Claims to Fidelity via e-mail. (ECF No. 149-55.) Approximately a week later, Fidelity sent an additional letter reaffirming its denial of coverage and further explaining why— notwithstanding that "funds from the Loan were disbursed directly to Petra for payment for work furnished to the Property"—the Petra Claims still did not trigger coverage under the Endorsement. (ECF No. 149-56.)

Ultimately, Fidelity entered into a Mutual Release and Settlement Agreement with Petra ("Petra Settlement Agreement"), by which NorthMarq agreed to pay Petra $3.55 million. (ECF No. 149-57.) The Petra Settlement Agreement recites that

> The Parties have agreed to enter into this Agreement for purposes of compromising, resolving and settling, as provided in this Agreement, any and all claims, disputes liabilities, duties, judgments and obligations between them, arising from or relating to the Project, the Bonds, the Liens, the Contract, the Building Loan Agreement, the Loan Disbursement Agreement, the Property, or the Work . . . .

(*Id.* at 2.)

**D.    Procedural History**

In this action, NorthMarq asserts three claims for (1) breach of contract – duty to defend, (2) breach of contract – indemnification, and (3) breach of the duty of good faith and fair dealing arising from Fidelity's denial of coverage under the Policy. (ECF No. 22 (Amended Complaint).) The Court previously granted early summary judgment to Fidelity on NorthMarq's breach of contract claims to the extent they were based on the existence of coverage under Covered Risks 10, 11, and 12 of the Policy. (ECF No. 147.) In so ruling, the Court expressly concluded that "any potential coverage available

under the Policy . . . may be found only under the Endorsement."  (*Id.* at 12–13.)  At that

time, the Court noted its "ruling relie[d] solely on the plain language of the Policy" and it

thus "d[id] not examine NorthMarq's arguments concerning extrinsic evidence and the

reasonable expectations doctrine."  (ECF No. 147 at 13 n.5.)

The parties' Motions now require the Court to analyze, among other issues,

whether NorthMarq is indeed entitled to coverage under the Endorsement.

## II. APPLICABLE STANDARDS

### A.    Standard of Review

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### B.    Interpretation of an Insurance Contract

The interpretation of an insurance policy is a question of law.  *Allstate Ins. Co. v.*

*Huizar,* 52 P.3d 816, 819 (Colo. 2002). "When construing the terms of insurance policies, [Colorado courts] apply principles of contract interpretation" and "attempt to carry out the parties' intent and reasonable expectations when they drafted the policies." *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.,* 90 P.3d 814, 819 (Colo. 2004). Accordingly, "courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003). "Courts should read the provisions of the policy as a whole, rather than reading them in isolation." *Id.*

"Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage." *Id.* "However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." *Id.* "A contractual term is ambiguous if it is susceptible on its face to more than one reasonable interpretation." *American Fam. Mut. Ins. Co. v. Hansen,* 375 P.3d 115, 120 (Colo. 2016) (citation omitted).

### III. DISCUSSION

NorthMarq seeks partial summary judgment on its breach of contract claims, asserting it is entitled to coverage as a matter of law based on both the plain language of the Endorsement and the reasonable expectations doctrine. (*See generally* ECF No. 148.) Fidelity seeks summary judgment on all of NorthMarq's remaining claims and raises a number of Policy provisions that it contends preclude NorthMarq from claiming any benefits under the Policy. (*See generally* ECF No. 150.)

Taken together, the parties' Motions present the following issues for the Court's

consideration: (1) whether NorthMarq is an "Insured" under the Policy; (2) whether
Fidelity had a duty to defend and indemnify NorthMarq based on the plain language of
the Endorsement; (3) whether NorthMarq is alternatively entitled to coverage based on
the application of the reasonable expectations doctrine; (4) whether NorthMarq's
settlement with KCSL terminated the Policy; and finally, (5) whether Fidelity is entitled to
summary judgment on NorthMarq's common law bad faith claim.  The Court takes up
each issue in turn.

## A.    Is NorthMarq an "Insured"?

### 1.    Pertinent Background

NorthMarq's "business involves originating loans through the [FHA] through
various FHA programs, securitizing those loans through the Government National
Mortgage Association (Ginnie Mae), and then servicing its loans."  (ECF No. 158 at 11 ¶
43.)  Ginnie Mae's Mortgage-Backed Securities[5] Guide (the "Guide") generally
describes this process as follows:

> Ginnie Mae guarantees securities that are backed by pools
> of mortgages and issued by mortgage lenders (Issuers)
> approved by Ginnie Mae.  Security holders receive a "pass-
> through" of principal and interest payments on a pool of
> mortgages, less amounts required to cover servicing costs
> and Ginnie Mae guaranty fees.  The Ginnie Mae guaranty
> ensures that the security holder receives the timely payment
> of scheduled monthly principal and any unscheduled
> recoveries of principal on the underlying mortgages, plus
> interest at the rate provided for in the securities.  If a
> borrower fails to make a timely payment on a mortgage, the
> Issuer must use its own funds to ensure that the security
> holders receive timely payment.  If an Issuer fails to ensure

---

[5] The Guide defines a "mortgage-backed security" as "[a] financial obligation secured by
a pool of mortgages."  (ECF No. 159-6 at 16.)  However, "[a] construction loan pool,"
specifically, "consists of *one* mortgage representing a single construction loan" (ECF No. 159-9
at 2 (emphasis added).)

that the funds necessary to make timely payment are
available or otherwise defaults in the discharge of its
responsibilities, Ginnie Mae, in accordance with its guaranty,
will make payments to security holders.

(ECF No. 159-7 at 1.)[6]

Before issuance of any mortgage-backed securities, Ginnie Mae requires, among
other things, that the "Issuer" "send[] the required loan and pool or loan package
documents to [an eligible] document custodian."  (ECF No. 159-7 at 10.)  These
documents must include "[t]he original of the note or other evidence of indebtedness
endorsed for insurance by FHA and endorsed or assigned in blank by the issuer."  (ECF
No. 159-9 at 3.)  "The document custodian reviews the documents and certifies to
Ginnie Mae that the pool or loan package is comprised of the loans listed on the
accompanying schedule."  (ECF No. 159-7 at 11.)  After conducting this review, the
document custodian "holds the loan documents in safekeeping for the life of the loan or
loan package."  (*Id.* at 8.)

Here, after NorthMarq originated the Loan to KCSL, Ginnie Mae "authorized the
issuance of securities" "based on and backed by" the Loan under one of its mortgage-
backed security programs.  (ECF No. 150-1 (Guaranty Agreement) at 1; ECF No. 150-3
(Prospectus) at 1.)  NorthMarq executed a blank endorsement of the Note.  (ECF No.
150-1 at 12.)  U.S. Bank served as the document custodian.  (ECF No. 158 at 13 ¶ 55.)

---

[6] The parties do not dispute the contents of the excerpts of the MBS Guide appended to
NorthMarq's briefing, and the MBS Guide is otherwise subject to judicial notice.  *See High
Desert Relief, Inc. v. United States,* 917 F.3d 1170, 1175 n.1 (10th Cir. 2019) ("we may . . . take
judicial notice of official government publications"); *see also S.E.C. v. Radius Capital Corp.,*
2012 WL 695668, at *1 n.2 (M.D. Fla. Mar. 1, 2012) (taking judicial notice of MBS Guide); Fed.
R. Evid. 201(b)(2) (permitting courts to take notice of a "fact that is not subject to reasonable
dispute because it . . . can be accurately and readily determined from sources whose accuracy
cannot be reasonably questioned") (*see also* ECF Nos. No. 158 at ¶¶ 44–48; ECF No. 174 at 4
¶¶ 44–48).

And J.P. Morgan Securities LLC ("J.P. Morgan") "was the investor in the Ginnie Mae-backed securities based on and backed by NorthMarq's loan to KCSL . . . ."  (ECF No. 158 at 13 ¶ 52.)  In other words, J.P. Morgan "agreed to purchase" the securities pursuant to a trade agreement with NorthMarq.  (ECF No. 150-4 at 1 ("Trade Agreement").)  NorthMarq continued to service the Loan.  (ECF No. 150 at 6 ¶ 18; ECF No. 158 at 6 ¶ 18; *see also* ECF No. 150-3 at 7 ("Under contractual arrangements between the Issuer and Ginnie Mae, the Issuer is responsible for servicing and otherwise administering the Mortgage . . . .").)

The Guaranty Agreement between NorthMarq and Ginnie Mae provides that, "pursuant to the Guide, the Issuer [NorthMarq] transfers, assigns, sets over and otherwise conveys to Ginnie Mae all of the Issuer's right, title, and interest in and to the pooled mortgages . . . ."  (ECF No. 150-5.)  Moreover, the related Prospectus explains:

> **Federal Income Tax Aspects**
>
> A Security Holder generally will be treated as owning a pro rata undivided interest in the Mortgage.  Accordingly, each Security Holder will be required to include in income its pro rata share of the entire income from the Mortgage, including interest . . . and discount, if any.  The income must be reported in the same manner and at the same time as it would have been reported had the Security Holder held the Mortgage directly.

(ECF No. 150-3 at 8.)

    2.   <u>Analysis</u>

Fidelity argues it is entitled to summary judgment on NorthMarq's claims because NorthMarq was not an "Insured" at the time the Liens were filed against the Property, thereby depriving it of standing to claim benefits under the Policy.  (ECF No. 150 at 2.)  More specifically, Fidelity asserts that NorthMarq must have owned the "Indebtedness"

in order to qualify as an "Insured" but, according to Fidelity, NorthMarq relinquished any
ownership interest it had in the "Indebtedness" to J.P. Morgan upon securitization of the
Loan.  (*Id.* at 13.)  The Court concludes that Fidelity's arguments fail, both because (1)
its interpretation of the definition of an "Insured" is unsupported by the Policy's plain
language and (2) even if it were correct as to the definition, Fidelity's argument rests on
an erroneous premise regarding the effect of NorthMarq's securitization of the Loan.

Beginning with the Policy's plain language, as the Court is required to do,
*Hansen,* 375 P.3d at 120, Condition 1, containing the Policy's "Definition of Terms," sets
forth the following:

> (d)     "Indebtedness": The obligation secured by the Insured
> Mortgage . . . .
>
> (e)     "Insured": The Insured named in Schedule A.
>
> > (i)     The term "Insured" also includes
> >
> > (A) the owner of the Indebtedness and each
> > successor in ownership of the Indebtedness, whether the
> > owner or successor owns the Indebtedness for its own
> > account or as a trustee or other fiduciary, except a
> > successor who is an obligor under the provisions of Section
> > 12(c) of these Conditions . . . .
>
> . . .
>
> (g)     "Insured Mortgage": The Mortgage described in
> paragraph 4 of Schedule A.

(ECF No. 149-6 at 5.)  Schedule A in turn reflects:

> 1.     Name of Insured:
>
> **NORTHMARQ FINANCE, L.L.C. AND U.S.
> DEPARTMENT OF HOUSING AND URBAN
> DEVELOPMENT, THEIR SUCCESSORS AND
> ASSIGNS, AS THEIR INTERESTS MAY APPEAR**
>
> . . .

4.    The Insured Mortgage and its assignments, if any, are described as follows:

Healthcare Deed of Trust Assignment of Leases, Rents and Revenue and Security Agreement in the amount of **$25,900,000.00** dated July 1, 2017, and filed for record on July 28, 2017 . . . executed by [KCSL] . . . in favor of [NorthMarq].

. . .

(*Id.* at 34.)

Fidelity argues that the Policy's definition of an "Insured" imposes a requirement that the "Insured" be "the owner of the Indebtedness . . . ."  (ECF No. 150 at 11.)  But the most natural reading of the definition is that the "Insured" includes (1) any person or entity identified as such in Schedule A *and,* in the disjunctive, (2) the owner of the "Indebtedness" and each successor in ownership of the "Indebtedness."  *See Colonial Mortg. Serv. Co. v. Commonwealth Land Title Ins. Co.,* 2014 WL 6237852, at *8 (E.D. Pa. Nov. 14, 2014) (agreeing with lender's position that it remained an "Insured," as the entity referred to in Schedule A, notwithstanding its subsequent transference of the note and mortgage).  There can otherwise be little dispute that NorthMarq satisfies the first scenario, as Schedule A plainly identifies NorthMarq among the "Name[s] of Insured."  (ECF No. 149-6 at 10 ¶¶ 1, 3.)

Notably, Fidelity's competing interpretation largely depends on a selective quotation of the Policy.  Indeed, it wholly omits the operative phrase "also includes" from the definition of an "Insured."  (*See* ECF No. 150 at 5 ¶ 12 (quoting Policy's definition of "Insured" as: "The Insured named in Schedule A. . . . the owner of the Indebtedness and each successor in ownership of the Indebtedness . . . ."); *see also id.* at 11 n.3 (similar).)  The Court takes a very dim view of Fidelity's attempt to "hide the ball"

through this critical omission.

Moreover, even assuming Fidelity is correct that NorthMarq must retain some ownership interest in the Indebtedness in order to qualify as an "Insured," NorthMarq persuasively argues that its sale of securities *backed by* the Insured Mortgage did not mean that NorthMarq relinquished all right, title, and interest in the Insured Mortgage to the purchaser of those securities, J.P. Morgan.  (ECF No. 158 at 19–22.)  Numerous sources concur that issuers of mortgage-backed securities guaranteed by Ginnie Mae generally *retain legal title* to the mortgage:

> Ginnie Mae guarantees the performance of the issuer rather than the underlying collateral, so it neither buys loans nor issues its own securities.  In return for the guarantee, which makes the securities more marketable for investors, the issuer pays a fee and gives Ginnie Mae a conditional interest in the underlying mortgages.
>
> Under the standard Guaranty Agreement between an issuer and Ginnie Mae, the issuer secures this conditional interest by assigning to *Ginnie Mae* the *equitable* title in the mortgage.  *The issuer, however, retains legal title* so that it may service the mortgages.  Put another way, the assignment to Ginnie Mae is a conditional assignment, which Ginnie Mae only has the right to accept and enforce if the issuer defaults on its obligations to holders of the mortgage-backed securities.

*See Hoffman v. Phelan Hallinan, LLP,* 2016 WL 4089163, at *4 (E.D. Pa. Aug. 2, 2016) (collecting cases, government publications, and secondary sources observing similarly) (first and third emphases added) (internal citations and quotation marks omitted).  It is clear to the Court that Fidelity's argument that the security holder, rather than the issuer, takes title to the underlying mortgage is irreconcilable with this general understanding.

Nor has Fidelity directed the Court to any evidence or authority demonstrating that the specific circumstances of the transaction at issue here compel a different result.

For instance, Fidelity cites the Guaranty Agreement, by which NorthMarq agreed to "transfer[], assign[], set[] over and otherwise convey[] to *Ginnie Mae* all of [NorthMarq's] right, title, and interest in and to the pooled mortgages."  (ECF No. 150-5 at 1 (emphasis added).)  The existence of a Guaranty Agreement transferring an interest in the Insured Mortgage to Ginnie Mae—not the investor, J.P. Morgan—is, of course, consistent with the notion that Ginnie Mae holds *equitable* title to the mortgage, while the lender retains *legal* title.

Fidelity also argues that the lack of evidence of any assignment to J.P. Morgan is no matter because "the beneficial interest in a deed of trust follows the note; an assignment is not required."  (ECF No. 174 at 8; *see also* ECF No. 150 at 12 n.5 (citing, among other sources, Colo. Rev. Stat. § 4-3-205(b).)  And here, Fidelity continues, it is undisputed that "NorthMarq (1) endorsed the Note given to it by KCSL (the obligation secured by the insured Deed of Trust) in blank and without recourse and (2) sent the original Note and Deed of Trust to a custodian, who held the documents at all relevant times."  (ECF No. 174 at 8.)  But the Court is also unconvinced by this argument for at least two reasons.  For one, it is inconsistent with Fidelity's own argument that J.P. Morgan owns the Indebtedness, because the document custodian in this circumstance was *U.S. Bank.*  (Section A.1. *supra*.)  Second, in view of the general understanding that the issuer of mortgage-backed securities guaranteed by Ginnie Mae generally retains legal title to the mortgage, it defies reason that an issuer's adherence to program requirements imposed by Ginnie Mae—including the delivery of the Note endorsed in blank and Deed of Trust to a document custodian—would result in the transfer of title to

the mortgage to the document custodian.  (*Id.*)[7]

Lastly, Fidelity's argument that J.P. Morgan must be the owner of the "Indebtedness" because it—not NorthMarq—held "the rights to receive payment by KCSL" is inaccurate.  (ECF No. 174 at 11.)  KCSL had the right to receive payment *from NorthMarq* irrespective of whether KCSL made payments on the Loan at all.  (*See, e.g.,* ECF No. 150-3 at 7 ("The Issuer is required to pay the full amount described above on each monthly payment date regardless of whether sufficient amounts have been collected on the Mortgage.").)  In this way, NorthMarq's securitization of the Loan and J.P. Morgan's subsequent purchase of those mortgage-backed securities "merely create[d] a separate contract, distinct from [KCSLs'] debt obligations under the Note." *Ladoucer v. Wells Fargo,* 2016 WL 8924931, at *2 (D. Colo. May 4, 2016).

For at least these reasons, the Court finds that Fidelity has failed to establish that NorthMarq is not an "Insured" under the Policy as a matter of law, and its Motion is denied on the same ground.

**B.    Is NorthMarq Entitled to Coverage Based on the Endorsement's Plain Language?**

The Court next analyzes whether NorthMarq is entitled to summary judgment on its breach of contract claims based *solely* on the plain language of the Endorsement.  In so doing, the Court separately analyzes whether Fidelity breached its duty to defend and its duty to indemnify.  *See Cyprus Amax,* 74 P.3d at 299 (observing that an insurer's "duty to defend is separate and distinct from an insurer's obligation to

---

[7] Although the Court has not searched for authority confirming as much, it highly suspects that Ginnie Mae requires issuers like NorthMarq to provide a Note endorsed in blank so that *Ginnie Mae* can solidify its conditional assignment in the event the issuer defaults.

indemnify its insured").

1.    <u>Duty to Defend</u>

"The duty to defend concerns an 'insurance company's duty to affirmatively defend its insured against pending claims.'"  *Id.* (quoting *Constitution Assocs. v. N.H. Ins. Co.,* 93 P.2d 556, 563 (Colo. 1996)).  "Because the duty to defend encompasses any potential claims raised by the facts and the duty to indemnify relates to the actual liability imposed, [the Colorado Supreme Court] has considered the duty to defend to be a broader concept than the duty to indemnify."  *Cyprus Amax,* 74 P.3d at 299.

Fidelity's contractual agreement to defend NorthMarq is embodied in Condition 5 of the Policy:

**5.    Defense and Prosecution of Actions**

(a)    Upon written request by the Insured, . . . the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured.  This obligation is limited to only those stated causes of action alleging matters insured against by this policy. . . . The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(ECF No. 149-6 at 6.)  And here, NorthMarq argues that the claims asserted in the Lien Suits were covered under both Section 3(b) and (3)(c) of the Endorsement, which provide:

The Company provides against loss or damage sustained by the Insured by reason of:

. . .

b.    The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance

on the Title recorded in the Public Records and not shown in
Schedule B; and

c.      The lack of priority of the lien of the Insured Mortgage
as security for each Construction Loan Advance made on or
before the Date of Coverage over any Mechanic's Liens if
notice of the Mechanic's Lien is not filed or recorded in the
Public Records, but only to the extent that direct payment to
the Mechanic's Lien claimant has been made by the
Company or by the Insured with the Company's written
approval.

(ECF No. 149-6 at 34 ¶ 3.)[8]

Ultimately, the Court does not reach Section 3(b), because it finds Fidelity had a

duty to defend NorthMarq in the Lien Suits under Section 3(c).

The Colorado Supreme Court has "long held that to determine whether a duty to

defend exists, courts must look no further than the four corners of the underlying

complaint (the 'four corners' or 'complaint' rule)."  *Cyprus Amax,* 74 P.3d at 299.  That

analysis specifically applies where an "insurer refuses to defend his insured."  *Cotter*

*Corp.,* 90 P.3d at 829 (observing that, when an insurer refuses to defend, "the issue of

[its] duty to defend does not hinge on the ultimate determination of coverage").  Thus,

"[i]n determining the existence of a duty to defend, the court must compare the

allegations of the underlying complaint with the relevant provisions of the insurance

policy."  *Apartment Inv. & Mgmt. Co. (AIMCO) v. Nutmeg Ins. Co.,* 593 F.3d 1188, 1193

(10th Cir. 2010).

"When the complaint 'alleges any facts that might fall within the coverage of the

policy,' the duty to defend arises."  *N.H. Ins. Co. v. TSG Ski & Golf, LLC,* 128 F.4th 1337

(10th Cir. 2025) (quoting *Hecla Min. Co. v. N.H. Ins. Co.,* 811 P.2d 1083, 1089 (Colo.

---

[8] Neither party invokes Section 3(a) of the Endorsement.

1991)).  Put differently, "if the alleged facts even potentially trigger coverage under the policy, the insurer is bound to provide a defense."  *Cyprus Amax,* 74 P.3d at 299.  In this way, "[a]n insurer has a heavy burden to overcome in avoiding the duty to defend, such that 'the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot.'"  *Id.* at 301 (quoting *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 614 (Colo. 1999)).  "Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept defense of the claim."  *Hecla Min. Co.,* 811 P.2d at 1089.

Here, there is no dispute that the underlying complaints alleged (1) a valid mechanic's lien with priority over NorthMarq's Insured Mortgage and (2) that the Liens were unrecorded as of the Date of Coverage—each of which are conditions of coverage under Section 3(c).[9]  (ECF No. 148 at 16 ¶¶ 74, 76; ECF No. 160 at 14 ¶¶ 74, 76; ECF No. 148 at 14 ¶ 68; ECF No. 160 at 13 ¶ 68.)  NorthMarq asserts that this is by itself sufficient to establish *potential* coverage under the Endorsement and trigger Fidelity's duty to defend.  (ECF No. 175 at 19.)  The Court agrees.

Still, Fidelity counters that its duty to defend was *not* triggered by the Lien Suits because the lien claimants did not allege facts satisfying Section 3(c)'s third prerequisite to coverage—"that direct payment to the Mechanic's Lien claimant has been made by

---

[9] Neither party appears to believe the fact that all of the Liens were *eventually* recorded precludes coverage under Section 3(c).  Rather, both seem to assume the operative question is whether the Liens were recorded *as of the Date of Coverage.*  (*See* ECF No. 160 at 21–22; ECF No. 175 at 9 ("The notice of the lien was not filed or recorded before the Date of Coverage.").)

the Company or by the Insured with the Company's written approval." (ECF No. 149-6 at 34.) Notably, the parties offer competing interpretations of this language. However, the Court finds it need not analyze which is correct at this point because, even under Fidelity's proffered interpretation, it had a duty to defend NorthMarq.

Fidelity argues that, in view of Section 3(c)'s "direct payment" language, it had no duty to defend NorthMarq in the Lien Suits because the subcontractor lien claimants alleged they "had contracts with and were to be paid by Petra or by another subcontractor"—not Fidelity or NorthMarq. (ECF No. 160 at 21.) Moreover, Fidelity argues the Petra Claims "similarly do not allege payment was made by Fidelity or NorthMarq *for the amounts sought in the Petra Lien;* rather, the Petra Claims allege its mechanic's lien was for amounts [KCSL] owed for unpaid change orders, unpaid retainage, and unpaid payment applications." (*Id.* at 21–22 (emphasis added).) In other words, the Court understands Fidelity to read Section 3(c) to require that Fidelity, or NorthMarq with Fidelity's approval, directly paid the mechanic's lien claimant in a previous disbursement of the Loan funds *specifically for the work and corresponding amounts giving rise to the mechanic's lien*. This is consistent with the view articulated in its letter denying coverage that Section 3(c) only extends coverage where a lien claimant was paid but the payment was "mis-disbursed"—*i.e.,* the payment did not actually reach the lien claimant. (ECF No. 149-56 at 5.)

Even assuming Fidelity is correct that Section 3(c) only extends coverage for "mis-disbursed" payments, the Court cannot logically find that a lien claimant's allegations that they are seeking to recover for unpaid work squarely places the claim out of coverage. Unless the lien claimant had prior, particularized knowledge that

Fidelity or NorthMarq had specifically remitted payment for an invoice that the lien claimant had not yet received, it is difficult for the Court to imagine a scenario where a lien claimant would affirmatively allege in a suit to recover fees for unpaid work that it had, at least in theory, already been "paid." From the perspective of the lien claimant, the central fact would remain that they are "unpaid," whether the payment was "mis-disbursed" or the payment was never remitted at all.

Fidelity's point regarding the lien claimants' allegations that they "had contracts with and were to be paid by Petra or another subcontractor"—not Fidelity or NorthMarq—fares slightly better. (ECF No. 160 at 21.) As a practical matter, the Court agrees that if the lien claimants had contractual relationships with Petra especially render it *more likely* that they had been directly paid for any work claimed in the Lien Suits by Petra. Still, it is not enough to eliminate all doubt as to whether coverage exists under Section 3(c).

As NorthMarq points out, Fidelity was only able to confirm that the Lien Suits fell outside the Policy's coverage—or at least, outside of Fidelity's interpretation of the Policy's coverage—after conducting an "investigation" to confirm that no direct payments had been made to the subcontractors and that neither Fidelity nor NorthMarq had "disbursed the amounts claimed unpaid by Petra." (ECF No. 149-54 at 3.) This it cannot do. If Fidelity had knowledge of extrinsic facts it believed obviated its coverage obligations under the Policy, the "appropriate course of action" was "to provide a defense to [NorthMarq] under a reservation of its rights to seek reimbursement should the facts at trial prove that the incident resulting in liability was not covered by the policy, or to file a declaratory judgment action after the underlying case has been adjudicated."

*Hecla Min. Co.,* 811 P.2d at 1089.  But it did not.  As a result, the Court is now confined

to the complaint rule.  *Cotter Corp.,* 90 P.3d at 829.

Accordingly, the Court finds that Fidelity had a duty to defend NorthMarq in the

Lien Suits as a matter of law, which it necessarily breached by refusing to provide any

defense to NorthMarq.[10]  *Cf. Continental Western Ins. Co. v. Colony Ins. Co.,* 69 F.

Supp. 3d 1075, 1084 (D. Colo. 2014) (finding insurer had a duty to defend and

breached its duty to defend "resulting from its action").

2.    Duty to Indemnify

"The duty to indemnify relates to the insurer's duty to satisfy a judgment entered

against the insured."  *Cyprus Amax,* 74 P.3d at 299.  Unlike the duty to defend, "[t]he

duty to indemnify arises only when the policy actually covers the harm and typically

cannot be determined until the resolution of the underlying claims."  *Id.* at 301.  Thus,

"where there is a duty to defend, there is not necessarily a duty to indemnify."  *N.H. Ins.

Co.,* 930 P.2d at 563.

"[T]he determination of whether coverage is ultimately required is a question of

fact" that "must normally await a determination of actual liability . . . ."  *Cyprus Amax,* 74

P.3d at 301 ("indemnity flows from the nature of the ultimate verdict, judgment, or

settlement").  However, "[w]here the claims do not proceed through the crucible of trial,

and instead are settled by the parties, the [indemnification] analysis becomes more

difficult."  *Id.*  In addition to "the final version of the complaint," "[e]xtrinsic evidence may

---

[10] Notably, Fidelity does not argue in its briefing that the exclusions set forth in Section 4 of the Endorsement extinguished its duty to defend.  As it is Fidelity's burden to "establish 'that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy,'" the Court will not proceed to analyze those provisions here.  *N.H. Ins. Co.,* 128 F.4th at 1345 (quoting *Cotter Corp.,* 90 P.3d at 829).

assist the trial court in determining whether and to what extent actual liability, as

represented by a verdict or settlement, is covered by an existing policy."  *Id.* at 301–02.

The Court separately analyzes below whether Fidelity had a duty to indemnify

NorthMarq for loss or damage sustained by reason of the (1) the Subcontractor Liens

and/or (2) the Petra Lien.  However, before doing so, the Court must first resolve the

interpretation issue it left unresolved above—the proper meaning of Section 3(c)'s

"direct payment" language.

a.    *Section 3(c)'s "Direct Payment" Language*

Recall that under Section 3(c),

> The Company provides against loss or damage sustained by
> the Insured by reason of:
>
> . . .
>
> c.    The lack of priority of the lien of the Insured Mortgage
> as security for each Construction Loan Advance made on or
> before the Date of Coverage over any Mechanic's Liens if
> notice of the Mechanic's Lien is not filed or recorded in the
> Public Records, but only to the extent that direct payment to
> the Mechanic's Lien claimant has been made by the
> Company or by the Insured with the Company's written
> approval.

(ECF No. 149-6 at 34.)

As summarized above, Fidelity interprets Section 3(c) to require that Fidelity, or

NorthMarq with Fidelity's approval, directly paid the mechanic's lien claimant in a

previous disbursement of the Loan funds specifically for the work and corresponding

amounts giving rise to the mechanic's lien.  The Court simply cannot agree that the

plain language of Section 3(c) supports such a reading.[11]  Rather, the Court agrees with

---

[11] Based on the Court's research, it appears to be the first in any jurisdiction to have the

NorthMarq that Section 3(c) merely states that coverage exists "to the extent that direct payment to the Mechanic's Lien claimant has been made by [Fidelity] or by [NorthMarq] with [Fidelity's] written approval," with no qualifier as to *for what* the mechanic's claimant must have been directly paid.  Or, as NorthMarq puts it, "Section 3(c) . . . limits the scope of coverage to direct payees[,] [b]ut nothing in the Policy says the lien must seek the advanced payment already disbursed."  (ECF No. 175 at 9.)

Only one authority gives the Court pause in reaching this conclusion, which Fidelity relegates to a footnote.  (ECF No. 160 at 19 n.7.)  In *Bankers Trust Company v. Transamerica Title Insurance Company,* the Tenth Circuit discussed an arrangement between a title insurance company and a construction lender much like the one between Fidelity and NorthMarq.  594 F.2d 231 (10th Cir. 1979).  There, as here, not only had the title insurance company "issued a title insurance policy to [the lender] which insured [the lender] a priority against any mechanic liens," but it had also "entered into a Disbursement Agreement whereby it "assumed the responsibility for disbursing the funds advanced by [the lender] pursuant to the Loan Agreement to the Proper claimants as construction progressed."  *Id.* at 232.  After the borrower defaulted, "mechanics' lien foreclosure suits were filed and defended" by the title insurance company, but it refused to indemnify the lender after "[a]ll of the liens were determined to be valid."  *Id.* at 234.

On appeal from a summary judgment finding in favor of the title insurance company, the Tenth Circuit observed that "the difficulty" with the lender's ensuing breach of contract claim was "that the cost of the work performed was greater than the

---

unenviable task of interpreting the ALTA 32.1.

money made available for payment." *Id.* It rejected the lender's "contention . . . that even though it failed to pay the full amount of the loan commitment, recovery may be had on the title insurance policy simply because mechanics' liens attached to the property." *Id.* Put differently, the Circuit reasoned "it is claimed that by issuance of a title insurance policy, [the insurer] became a guarantor of payment for all work actually performed," which was "more than the insurance contract calls for." *Id.*

Despite the factual similarities of *Bankers Trust,* it does not persuade the Court that it should depart from the Endorsement's plain language and interpret Section 3(c) to only extend coverage for "misdisbursements" for at least two reasons. First, in *Bankers Trust,* the Tenth Circuit noted at the outset that the parties' Disbursement Agreement was "critical to the controversy presented . . . ." *Id.* at 232. But here, *Fidelity* has repeatedly urged the Court that it *cannot* consider any evidence extrinsic to the Policy when interpreting the Endorsement's plain language. (*E.g.,* ECF No. 106 at 10 ¶ 46 ("The Disbursement Agreement does not affect the ML coverage provided by the Policy.").) And in that respect, the Court agrees. Colorado case law is clear that "[a]n ambiguity must appear in the four corners of the document <u>before</u> extrinsic evidence can be considered." *Hansen,* 375 P.3d at 117 (emphasis in original) ("extrinsic evidence cannot create ambiguity; it is an aid to ascertaining the intent of the parties once an ambiguity is found"). Accordingly, the Court will not look to the parties' obligations under the Disbursement Agreement to give meaning to Section 3(c) where its plain language is otherwise unambiguous.

Second, the Tenth Circuit's conclusion in *Bankers Trust* was premised on a policy exclusion that Fidelity has not invoked here. Specifically, the Circuit reasoned

that the title insurer had no obligation to indemnify the lender because "the resulting
mechanics' liens must be considered to have been created or suffered by the insured
claimant and such liens are expressly excluded from coverage by the language of the
title policy."  594 F.2d at 234.  While the Policy includes a similar exclusion, Fidelity
does not argue it precludes coverage to NorthMarq under the circumstances here.
(ECF No. 149-6 at 5 ¶ 3(a) (excluding from coverage loss or damage "that arise[s] by
reason of . . . [d]effects, liens, encumbrances, adverse claims, or other matters (a)
created, suffered, assumed, or agreed to by the Insured Claimant").)  Accordingly, the
Court does not consider it.

In the end, if Fidelity had intended to limit Section 3(c) in accordance with its
interpretation, it very well could have done so.[12]  But where no such limiting language
exists, Fidelity's "strained construction[] should be avoided."  *Huizar,* 52 P.3d at 819.  As
one federal court observed in a similar dispute concerning the scope of a title insurance
policy's coverage for mechanic's liens:

> The simple fact that is controlling in this case is that two
> sophisticated business entities entered into this contract—
> the title policy.  It insured against losses due to unrecorded
> liens on this project.  It did not exclude lien coverage until all
> loan funds were expended.  It did not exclude liens that
> arose from work and materials for which loan funds had not
> already been advanced.  To rewrite the contract to add these

---

[12] While the Court finds no ambiguity as to the meaning of Section 3(c) and thus does
not look to extrinsic evidence to interpret it, it is well persuaded based on evidence in the record
that Fidelity knew how to limit coverage under the Endorsement consistent with its proffered
interpretation, had it desired to do so.  Indeed, in its second letter explaining its denial of
coverage to NorthMarq, Fidelity misquoted Section 3(c) as providing coverage "only to the
extent that direct payment to the Mechanic's Lien claimant *for the charges for the services,
labor, materials or equipment for which the Mechanic's Lien is claimed* has been made by the
Company or by the Insured with the Company's written approval."  (ECF No. 149-56 at 4, 5
(emphasis added; original emphasis omitted).)  Of course, the italicized language does not
appear in the Endorsement.  (*Compare id. with* ECF No. 149-6 at 34.)

provisions is beyond the power of this court.

*Mid-South Title Ins. Corp. v Resolution Trust Corp.,* 840 F. Supp. 522, 531 (W.D. Tenn.
1993).  Although the Court acknowledges that the mechanic's lien coverage provision at
issue in *Mid-South Title* was not identical to the one at issue here, in the Court's view,
the same reasoning rings true.

Thus, the Court interprets Section 3(c) as providing coverage when (1) a
mechanic's lien claimant asserts priority over the Insured Mortgage, (2) the mechanic's
lien has not been recorded in the public records,[13] and (3) the mechanic's lien claimant
has been directly paid by Fidelity or by NorthMarq with Fidelity's approval—irrespective
of whether that payment was for the particular work giving rise to the lien.

  b.  *Subcontractor Liens*

Whether Fidelity had a duty to indemnify NorthMarq for any loss or damage it
sustained as a result of the Subcontractor Liens presents the more straightforward
question.  There is no dispute that all payments to the subcontractors were actually
processed through Petra.  (ECF No. 148 at 11 ¶ 55.)  This necessarily means that none
of the Subcontractor Claimants were directly paid for *any* work on the Project by Fidelity
or NorthMarq with Fidelity's approval, thereby foreclosing coverage to NorthMarq under
Section 3(c)'s plain language.  As a result, NorthMarq is not entitled to judgment as a
matter of law to the extent its breach of contract claim is based on Fidelity's alleged duty
to indemnify it for loss or damage sustained by reason of the Subcontractor Liens.

---

[13] Neither party appears to believe the fact that all of the Liens were *eventually* recorded
precludes coverage under Section 3(c).  Rather, both seem to assume the operative question is
whether the Liens were recorded *as of the Date of Coverage.*  (*See* ECF No. 160 at 21–22; ECF
No. 175 at 9 ("The notice of the lien was not filed or recorded before the Date of Coverage.").)

       c.    *Petra Lien*

Fidelity's duty to indemnify NorthMarq as to the Petra Lien presents a tricker

question.  It also requires the Court to consider the exclusions to coverage set forth in

Section 4 of the Endorsement.

> This policy does not insure against loss or damage (and the
> Company will not pay costs, attorneys' fees or expenses) by
> reason of any Mechanic's Lien arising from services, labor,
> material or equipment:
>
>     a.    Furnished after Date of Coverage; or
>
>     b.    To the extent that the Mechanic's Lien claimant was not
>         directly paid by the Company or by the Insured with the
>         Company's written approval.

(ECF No. 149-6 at 34.)

Three issues are prescient to Fidelity's duty to indemnify NorthMarq as to the

Petra Lien: (1) whether direct payment was in fact made to Petra by Fidelity or

NorthMarq with Fidelity's approval, in satisfaction of Section 3(c); (2) whether the Petra

Lien arises from services, labor, material, or equipment furnished *before* the Date of

Coverage, such that coverage is not excluded under Section 4(a); and (3) assuming

these conditions satisfied, whether NorthMarq sustained loss or damage by reason of

the lack of priority of the lien of the Insured Mortgage over Petra's Lien.  (*See* ECF No.

149-6 at 34.)

As to the first issue, NorthMarq argues the direct payment requirement is easily

satisfied because, as of the Date of Coverage, "NorthMarq had made Construction Loan

Advances totaling $17,345,524.12 of the Loan primarily to Petra."  (ECF No. 148 at 32.)

Fidelity's response puts up little defense to this point.  To the contrary, it expressly

acknowledges that, "[i]n fact, Fidelity disbursed directly to Petra $16,827,106."  (ECF

No. 160 at 26.)  Fidelity otherwise argues that Section 3(c)'s direct payment

precondition is not satisfied based on the same interpretation issues the Court resolved

above—namely, that Section 3(c) requires that the "amounts sought by Petra's Lien

were part of Construction Loan Advances that were all made on before the . . . Date of

Coverage."  (ECF No. 160 at 24.)  For the same reasons discussed in the context of

Fidelity's duty to defend, the Court again rejects Fidelity's interpretation of the direct

payment language in Section 3(c).[14]

As to the second issue, NorthMarq concedes that the evidence shows that a

portion of the Petra Lien involved work furnished *after* the Date of Coverage.  (ECF No.

175 at 11.)  But it also asserts that the same evidence likewise shows that a portion of

the Petra Lien involved work furnished *before* the Date of Coverage, such that the

exclusion in Section 4(a) does not apply.  (ECF No. 148 at 33.)  NorthMarq specifically

refers to the "Verified Statements Relating to Petra, Inc.'s Claims Pursuant to Section 9

of the Amended Case Management Order" that Petra filed in the Lien Suits.  (ECF No.

148 at 15 ¶ 72; ECF Nos. 149-36 through 149-40 ("Verified Statements").)  According to

NorthMarq, the Verified Statements establish that

> The amounts comprising the Petra Lien that were for
> services, labor, material, or equipment furnished before
> November 18, 2019 include:
>
> a.  Petra's Pay Application 28 for work and services

---

[14] The parties appear to assume that the exclusion in Section 4(b) regarding direct
payment has the same meaning as the direct payment language found in Section 3(c).
(*Compare* ECF No. 149-6 at 34 ¶ 4(b) *with id.* at ¶ 3(c).)  NorthMarq asserts "the exclusion in
Section 4(b) mirrors that in Section 3(c)."  (ECF No. 175 at 8.)  And Fidelity does not separately
address the language of Section 4(b) at all in its briefing.  (ECF No. 160 at 26.)  The Court will
refrain from injecting an interpretation issue where the parties perceive none, and it thus
interprets Section 4(b) as imposing the same material requirement as the direct payment
language in Section 3(c).

performed in November 2019 in the amount of $188, 609;

   b.  Petra's May 29, 2019 Change Order Pay Application in
       the amount of $134,998;

   c.  Petra's November 5, 2019 Change Order Pay Application
       in the amount of $594,570;

   d.  Earned retainage totaling approximately $1,998,740.00;
       and

   e.  Change Order Requests totaling $1,838,995.27.

(ECF No. 148 at 15 ¶ 72 (citing ECF Nos. 149-36 through 149-40).)

Nevertheless, Fidelity denies NorthMarq's allegation that the Verified Statements establish that portions of the Petra Lien were for services, labor, material, or equipment furnished before November 18, 2019.  (ECF No. 160 at 13 ¶ 72.)  It asserts, for instance, that "[t]he cited evidence shows Petra made various change order requests seeking to adjust the project completion date and contract sum but fails to identify whether they were approved or if any work related to the change orders was furnished prior to November 18, 2019."  (*Id.*)

The Court is unconvinced.  As just one example, included in the documentation supporting Petra's Verified Statements is a payment application dated May 29, 2019.  (ECF No. 149-38 at 1.)  The first page of that payment application includes a notarized certification "that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment *has been completed* in accordance with the Contract Documents . . . ."  (*Id.* (emphasis added).)  Fidelity gives the Court no reason to believe there is a genuine dispute of fact as to the accuracy of this certification.  Accordingly, it is alone sufficient to establish that *some* portion of Petra's Lien was based on work furnished before November 18, 2019.

Still, Fidelity also objects that "NorthMarq failed to identify any amounts sought by Petra for work furnished before November 18, 2019 throughout discovery in this matter and is barred from using any such information to supply evidence on a motion or at trial."  (ECF No. 160 at 13 ¶ 72.)[15]  Fidelity advances this same argument in contending that it is entitled to summary judgment on the issue of coverage, where it elaborates that it believes NorthMarq is "procedurally barred from trying to establish coverage under the Endorsement because of its consistent failure to identify any evidence tending to support this claim."  (ECF No. 150 at 20–24.)  Fidelity cites, among other perceived discovery failures, NorthMarq's purported "non-responses" to two interrogatories propounded by Fidelity, asking NorthMarq to (1) "Identify all amounts sought by Petra in the Lien Suit that you contend were for work furnished before November 18, 2019" and (2) "Identify all amounts sought by Petra in the Lien Suit that you contend were part of a disbursement made by Fidelity to Petra."  (ECF No. 150 at 22–23; ECF No. 151-32 at 2–3.)

The Court is wholly unpersuaded that Fidelity's complaints about discovery preclude NorthMarq from relying on the Verified Statements as evidence in support of its claim—much less that they justify finding in Fidelity's favor on the issue of coverage. *Cf. Milam v. Pafford EMS,* 729 F. App'x 632, 635–36 (10th Cir. 2018) (finding no merit in plaintiff's attempt to avoid summary judgment based on defendant's alleged failure to disclose relevant facts where plaintiff could have challenged the sufficiency of the discovery before the dispositive motion deadlines passed or moved for relief under Rule

---

[15] The Court assumes Fidelity's unexplained objection that the cited evidence "cannot be presented in a form that would be admissible at trial" under Federal Rule of Civil Procedure 56(c)(2) relates to the same issue.  (ECF No. 160 at 13 ¶ 72.)

56(d) but did neither); *Chase Mfg., Inc. v. Johns Manville Corp.,* 601 F. Supp. 3d 911, 920 (D. Colo. Apr. 26, 2022) ("tak[ing] into consideration all evidence which Plaintiff submits as part of the current briefing," given that "Defendant did not object to the sufficiency of the interrogatory answers during the discovery phase of litigation" and, in any event, "Defendant already knew of that evidence").

For one, the Court's conclusions herein render the information sought in Fidelity's second interrogatory irrelevant. Moreover, NorthMarq's written responses to the cited interrogatories invoked Federal Rule of Civil Procedure 33(d) and specifically directed Fidelity to the Verified Statements. (ECF No. 151-32 at 2–3.) Relying on out-of-Circuit authority, Fidelity argues that "a Rule 33(d) response is inappropriate where the interrogatory calls for 'the exercise of particular knowledge and judgment on the part of the responding party.'" *Hege v. Aegon USA, LLC,* 2011 WL 1119871, at *3 (D.S.C. Mar. 25, 2011). Fidelity does not explain, however, what "superiority of knowledge or familiarity with the [Verified Statements]" it believes NorthMarq possesses, nor that the amounts sought by the Petra Lien *cannot* be calculated from the Verified Statements.

Finally, NorthMarq asserts it incurred loss or damage covered by Section 3(c), as evidenced by its settlement agreement with Petra. (ECF No. 148 at 33–34; ECF No. 149-57.) Nevertheless, Fidelity asserts "[t]here is no evidence NorthMarq funded the settlement payment to Petra." (ECF No. 160 at 16 ¶ 91.) In support, it cites the deposition testimony of NorthMarq's Rule 30(b)(6) witness, generally explaining that NorthMarq's parent company, NorthMarq Capital, LLC, advances the money to pay expenses related to the Property, including "the settlement with Petra to clear the liens," with "the gains and losses ultimately . . . reflected in NorthMarq Finance." (ECF No.

151-13 at 50:20–54:8.)

Despite this fact question as to which entity in the NorthMarq corporate structure absorbed the "loss" from an accounting perspective, the Court is nevertheless persuaded that the settlement agreement is sufficient to establish there was, in fact, loss or damage covered by Section 3(c).  Accordingly, the Court finds as a matter of law that Fidelity had a duty to indemnify NorthMarq for the loss or damage *it* sustained by reason of the lack of priority of the Insured Mortgage over the Petra Lien, but only to the extent that the Petra Lien was based on services, labor, material or equipment Petra furnished *before* November 18, 2019.  The question of precisely what loss or damages *NorthMarq Finance, L.L.C.* ultimately realized will be a fact question to be resolved at trial.

**C.    Is NorthMarq Entitled to "Full" Coverage Under the Reasonable Expectations Doctrine?**

The substantial part of NorthMarq's Motion is centered—not on the Endorsement's plain language—but on why it believes it is entitled to "full" mechanic's coverage based on the reasonable expectations doctrine.  Accordingly, the Court considers in this section whether the reasonable expectations doctrine fills the gaps in coverage the Court has identified based on the Endorsement's plain language—namely, whether Fidelity owes a duty to indemnify NorthMarq for any losses it allegedly sustained by reason of (1) the Subcontractor Liens or (2) the Petra Lien, even to the extent it is based on work furnished *after* the Date of Coverage.

1.    <u>Pertinent Background</u>

At some point in 2016, months before Loan closing, NorthMarq and Fidelity began discussing the terms of a title insurance policy in connection with the Project.

(*See* ECF No. 149-27 (September 2016 e-mails between NorthMarq's closing counsel and Fidelity regarding a pro forma policy).)  According to NorthMarq, as a condition to providing mortgage insurance under the Section 232 Program, "HUD . . . requires the Insured Mortgage have priority over any other lien or encumbrance at initial endorsement (construction loan closing), during the construction phase, and at final endorsement."  (ECF No. 148 at 4 ¶ 4.)  Thus, NorthMarq asserts that "it is industry standard for HUD and the lender [to] require title insurance to insure the Insured Mortgage remains prior to all mechanic's liens."  (*Id.* at 4 ¶ 7.)

Steve Wood, the current State Underwriter for Fidelity in Colorado, testified at deposition that Fidelity provides "a spectrum of different" mechanic's lien coverage that are "all specific to Colorado," which he referred to as "upfront mechanic's lien coverage," "incremental mechanic's lien coverage," "limited mechanic's lien coverage, limited to certain parties," and "full mechanic's coverage, which is different than upfront coverage."  (ECF No. 149-12 at 72:20–73:9; 74:21–25.)  Wood elaborated that "full mechanic's lien coverage" "means that [Fidelity] would not be taking exception to mechanic's liens that might arise in any fashion, . . . in any way."  (*Id.* at 74:8–12.)  He testified that "one way" to effectuate "full mechanic's lien coverage" in a title policy is by "[d]eletion of any mechanic's lien exception."  (*Id.* at 74:13–17, 75:12–19, 75:24–76:6.)

In connection with their ongoing negotiations of the Policy terms, NorthMarq's closing counsel prepared and provided to Fidelity's underwriting team a document titled "HUD's Title Insurance Requirements," which stated in pertinent part:

> h.    The Policy must show that the title is vested in the Borrower free and clear of encumbrances or defects (other than those submitted to and approved by HUD) and that the Deed of Trust constitutes a first lien at the date the

note is endorsed by HUD for mortgage insurance.

. . .

   k.  The most frequent problems arising in
connection with title policies involve the Schedule B
exceptions. . . .

     (2)  Exceptions which will be objectionable .
. .

      (b)  liens, such as mechanics' and
materialmen's or judgment liens;

. . .

      (d) all standard exceptions such as the
exception concerning mechanic's liens, claims to water,
patent reservations, etc. . . .

(ECF No. 149-6 at 5–6; *see also* ECF No. 148 at 6 ¶ 20.)  Wood explained at deposition

that, in "the after-the-commitment phase," the prospective insured "get[s] a pro forma to

show [them] what the policy will look like based on what they want . . . ."  (ECF No. 114

at 114:10–25.)  At least as of June 2017, Schedule B of the pro forma policy that Fidelity

issued to NorthMarq for the Project contained a general exception from coverage for

mechanic's liens:

   [T]his policy does not insure against loss or damage, and
   [Fidelity] will not pay costs, attorneys' fees, or expenses that
   arise by reason of . . . [a]ny lien or right to a lien for services,
   labor, or material heretofore or hereafter furnished, imposed
   by law and not shown by the Public Records.

(the "ML Exception") (ECF No. 149-13 at 12.)

   At some point prior to closing, a representative of HUD directed Fidelity to

"please delete" the ML Exception, elaborating that "[t]he mechanics' lien exception must

be deleted from Schedule B" as it "is required for all FHA-insured loans."  (ECF No. 149-

23 at 1.)  Fidelity initially declined to do so.  (*See* ECF No. 149-18 (June 17, 2017 e-mail

from Fidelity title officer attaching "the requested changes to the proforma loan other

than as to the deletion of [the ML Exception" and explaining "[t]his is a construction loan

so the general mechanic's lien exception would remain").)

Approximately a month later, however, after apparent further discussion "about

obtaining ML Coverage," Fidelity agreed to "submit to underwriting . . . to determine if

that is available" pending receipt of additional documentation, with the caveat that there

was "not a guarantee of approval at this time."  (*See* ECF No. 149-20 (July 17, 2017

email from Fidelity); *see also* ECF No. 149-22 (internal Fidelity email from same date

noting that "Janet wants 'FULL' deletions for lender and this is a HUD so they are not

taking no for an answer"); ECF No. 149-23 (internal Fidelity e-mail noting "[w]e were just

advised two days ago HUD will not accept a ML exception in the policy and they have

asked that 4 be deleted in full").)

The next day, Fidelity informed NorthMarq that "[i]n lieu of the CLTA 122's with

disbursement we will reflect the ALTA 32.1 at $25,950.00 and the ALTA 33 at

$2,000.00."  (ECF No. 149-26; *see also* ECF No. 149-27 (September 2016 email from

Fidelity title officer noting "[w]e are set up to issue 122's as noted on fee on commitment

for disbursements after closing . . . .").)  At the same time, Fidelity reiterated that "[t]he

approval of these endorsements as to ml disbursements and coverages are still subject

to the underwriting approvals" and receipt of the documentation Fidelity requested from

NorthMarq.  (*Id*.)

Shortly thereafter, Fidelity's title officer notified NorthMarq that she had "just

received approval for deletion of [the ML Exception] on the loan policy."  (ECF 149-21.)

And another several days later, NorthMarq's closing counsel circulated an "updated pro

forma policy" to representatives of HUD and NorthMarq for review.  (ECF No. 149-28.)

Therein, she highlighted that the updated pro forma "removes the general mechanic's

lien exception."  (*Id.*)  Moreover, she stated that "[t]he title company also indicated that

'based on change in coverages and available endorsements' they need to include the

ALTA 32.1-06 and the ALTA 33-06 for the pending disbursements and loss of priority

endorsements."  (*Id.*)  In response, a representative of HUD indicated that he was "fine

with using the ALTA 32 and 33."  (*Id.*)

  Fidelity's Endorsement Manual instructs that the issuance of the ALTA 32.1 and

ALTA 33

> requires the following exception to be included in Schedule B
> of the policy in the place of the general mechanic's lien
> exception:
>
> > ***Any statutory lien or claim of lien, affecting
> > the Title, that arises from services provided, labor
> > performed, or materials or equipment furnished,
> > except as insured by the attached ALTA 32-06 [or
> > 32.1-06 or 32.2-06 whichever is used] as it may be
> > revised by ALTA 33-06 (Disbursement)
> > Endorsements.***
>
> You may modify this exception to use local terminology.  The
> important thing is to raise the exception for all other
> mechanic's lien issues not covered by these limited
> endorsements but carve out the coverage that is afforded by
> them.

(ECF No. 148-1 at 9–10.)  This language does not appear in Schedule B of the Policy.

(ECF No. 149-6 at 12.)

  In addition, to mitigate its own risks in providing mechanic's lien coverage,

Fidelity required the Borrower, its principals, and Contractor to execute Mechanic's

Liens Indemnity Agreements ("ML Indemnity Agreements").  (ECF No. 148 at 7 ¶ 29.)

The ML Indemnity Agreements provide, in relevant part:

3.      INDEMNITOR has an interest in the issuance of, and
desires COMPANY from time to time to issue, the title policy
. . . , together with endorsements thereto, covering the Real
Property or lots or portions thereof, insuring against loss
which may be sustained by reason of Mechanics' Liens, or
without exception as to Mechanics' Liens, arising out of such
works of improvement, or insuring holders of mortgages or
deeds of trust against loss by reason of the priority of any
such Mechanics' Liens over said mortgages or deeds of
trust.

. . .

5.      In order to induce COMPANY to issue and in
consideration of the issuance by COMPANY of such Policy
of title insurance and endorsements as it may be willing to
issue, INDEMNITOR promises and agrees to hold harmless,
protect and indemnify COMPANY from and against any and
all liabilities, losses, damages, expenses, charges, and fees,
including but not limited to attorneys' fees and expenses of
litigation, which it may sustain, under each and every Policy
of title insurance or endorsements thereto, which it may at
any time issue, resulting directly or indirectly from any
Mechanics' Liens, or claims thereof, affecting the Real
Property or any portion or portions thereof covered by such
Policy and arising out of any such work or works of
improvement, and to pay all costs, expenses and attorneys'
fees incurred in the enforcement of this Agreement; provided
that the COMPANY satisfies its obligations as the disbursing
agent, and the foregoing Indemnity and hold harmless does
not apply if the COMPANY has failed to perform its
obligations as the disbursing agent.

. . .

9.      In the event that any Mechanics' Liens or claims
thereof arising out of any such work of improvement shall be
filed against the Real Property or any action shall be
commenced to foreclose such liens, INDEMNITOR agrees
within twenty (20) days thereafter to cause such Mechanics'
Liens to be released of record and any such actions
dismissed or to record a bond effective to release the Real
Property from the lien and from any action to foreclose such
lien and to do such other acts as COMPANY may require;
and should INDEMNITOR fail to do so, COMPANY is
authorized but not obligated to advance and pay such
amounts as shall, in COMPANY's sole and absolute

discretion, be deemed necessary to procure releases of
such claims or liens and satisfactions of any judgments of
foreclosure rendered in such actions, or otherwise necessary
for the protection of COMPANY's Insured and itself, and
INDEMNITOR agrees to reimburse COMPANY on demand
for all amounts so advanced, with interest at the maximum
legal rate from the date advanced by COMPANY until the
date of reimbursement by INDEMNITOR; provided, however,
that the foregoing shall not apply with respect to liens filed as
a result of the COMPANY failing to performs [*sic*] its
obligations as disbursing agent.

(ECF No. 149-11 at 1–2.)  The ML Indemnity Agreements further define "Mechanics'

Liens" as

> any and all of the liens granted by statute or otherwise to
> mechanics, materialmen, contractors, subcontractors,
> lessors of equipment, artisans, architects, engineers, land
> surveyors, machinists, builders, and all other persons or
> laborers of every class which have performed labor upon,
> bestowed skills or other necessary services on, or furnished
> materials in connection with any work of improvement upon
> the Real Property.

(*Id.* at 2.)

Moreover, paragraph 9 of the Disbursement Agreement states:

> In consideration of the agreement by the Title Company to
> issue its mortgagee's policy of title insurance without
> exception therein to filed and unfiled mechanics' and
> materialmens' liens, the Contractor agrees to indemnify and
> hold harmless the Lenders and the Title Company of and
> from any and all loss, cost, damage and expense, including
> reasonable attorneys' fees, which any of them shall or may
> suffer or incur or become liable for arising directly or
> indirectly out of or on account of any mechanics' or
> materialmen's liens.  It is understood that the Contractor's
> agreement of indemnity extends only to such liens as arise
> from work performed or materials or services provided
> pursuant to the Construction Contract and for which the
> Contractor has been paid.

(ECF No. 149-10 at 6 ¶ 9(a).)

2.    Analysis

The reasonable expectations doctrine can be applied in two ways.  *Bailey v. Lincoln General Ins. Co.,* 255 P.3d 1039, 1050 (Colo. 2011).  "The first is where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue."  *Id.*  The second is "where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise."  *Id.*

The Court easily finds that NorthMarq is not entitled to judgment as a matter of law based on the first application of the doctrine.  Even from the perspective of an ordinary reader, the Endorsement's plain language is quite *unambiguou*s that coverage is precluded for (1) services furnished by lien claimants after the Date of Coverage and (2) where the mechanic's lien claimant is not a direct payee of Fidelity or NorthMarq. (ECF No. 149-6 at 34); *cf. 2-BT, LLC v. Preferred Contractors Ins. Co. Risk Retention Group, LLC,* 2013 WL 5729932, at *7 (D. Colo. Oct. 18, 2013) (similarly concluding reasonable expectations doctrine did not apply where "a[n] ordinary reader would understand that liabilities for the use of heat sources are excluded by the policy").

The second application, however, requires further analysis.  It applies where "an insured . . . demonstrate[s] through extrinsic evidence that their expectations of coverage are based on specific facts that make these expectations reasonable." *Saccomano v. Progressive Direct Ins. Co.,* 2023 WL 12057341, at *2 (Colo. App. Feb. 16, 2023).  "These specific facts must show that, through procedural or substantive deception attributable to the insurer, an objectively reasonable insured would have believed he or she possessed coverage later denied by an insurer."  *Bailey,* 255 P.3d at

40

1054; *see also Craft v. Philadelphia Indemnity Ins. Co.,* 343 P.3d 951, 960 (Colo. 2015)

(noting that the reasonable-expectations doctrine is "a means of avoiding an unfair

result *where the insurer has engaged in some sort of deception*" (emphasis added)).

      The Court understands NorthMarq to argue only the existence of procedural

deception (ECF No. 148 at 27) which can alone support the application of the

reasonable expectations doctrine. *See Bailey,* 255 P.3d at 1055 ("Colorado courts . . .

have upheld reasonable coverage-expectations on facts grounded only in procedural

deceptiveness.")  In general, procedural deception relates to the requirement that

"[i]nsurers seeking to avoid liability 'must do so in clear and unequivocal language and

must call such limiting conditions to the attention of the insured.'"  *Cyprus Amax,* 74

P.3d at 307 (quoting *Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.,* 917 P.2d 321,

324 (Colo. App. 1995)).  "Absent such disclosure, coverage will be deemed to be that

which could be expected by the ordinary lay person."  *Tynan's Nissan,* 917 P.2d at 324.

      NorthMarq argues that the evidence demonstrates Fidelity engaged in

procedurally deceptive conduct as a matter of law based on

> (1) NorthMarq's insistence that full mechanic's lien coverage
> be provided under the Policy and Fidelity's agreement to
> delete the ML Exception from the Policy; (2) Fidelity's failure
> to explain it was providing only limited and illusory
> "misdisbursement" coverage; (3) the representations about
> scope of coverage in the ML Indemnity Agreements and
> Disbursement Agreement; and (4) the fact that the payment
> arrangement for subcontractors was known to Fidelity, yet
> Fidelity proposed a version of the ALTA 32 endorsement
> intended to insure subcontractor supplies liens that it now
> argues does *not* cover the Subcontractor Liens.

(ECF No. 148 at 27.)  Ultimately, the Court concludes that it need not proceed past the

first issue, because the alleged fact that NorthMarq insisted upon "full mechanic's lien

coverage" underlies each of the four ways Fidelity allegedly engaged in procedurally

deceptive conduct.  (*See id.* at 27–30.)  And that much is genuinely in dispute.

NorthMarq's argument that it insisted upon full mechanic's lien coverage turns in substantial part upon its argument that both parties understood "*full deletion* of the standard mechanic's lien exception from the Policy . . . to provide 'full mechanic's lien coverage . . . ."  (ECF No. 160-7 at 2–3.)  In other words, according to NorthMarq, it necessarily follows from its evidence demonstrating that it requested full deletion of the ML Exception that it was also seeking full mechanic's lien coverage.

However, Fidelity disputes the extent to which full deletion of the ML Exception necessarily gives rise to "full mechanic's lien coverage."  For instance, Wood testified that, "in the context of a HUD project, if HUD is requiring that the mechanic's lien exception be removed from a policy," that does not mean "that HUD is requiring unfettered or unconstrained mechanic's lien coverage."  (ECF No. 160-3 at 139:5–11.) Moreover, Fidelity correctly points out that there is at least no documentary evidence demonstrating that NorthMarq ever *explicitly* requested "full mechanic's lien coverage." (ECF No. 160 at 31.)  Indeed, "NorthMarq admits that it did not use the exact phrase 'full mechanic's lien coverage' in any email prior to July 31, 2017."  (ECF No. 160-7 at 1.)

Thus, because there are genuine disputes of material fact as to the threshold issue of whether NorthMarq requested "full mechanic's lien coverage"—and whether the parties' mutually understood that the deletion of the ML Exception was necessarily intended to effectuate such coverage—NorthMarq is not entitled to summary judgment on the application of the reasonable expectations doctrine.

On the other hand, the Court does not understand Fidelity's Motion to seek

summary judgment on the application of the reasonable expectations doctrine, so the Court does not proceed to consider that issue.  (ECF No. 150 at 20–24.)  As a result, whether Fidelity engaged in procedurally defective conduct justifying the application of the reasonable expectations doctrine will be decided by the jury.  *Cf. Saccomano,* 2023 WL 12057341, at *4 (denying summary judgment based "a genuine dispute of material fact as to whether Progressive engaged in procedurally deceptive conduct and [the insured] is entitled to protection under the doctrine of reasonable expectations").

**D.    Did the Policy Terminate Upon NorthMarq's Settlement With KCSL?**

  1.    <u>Pertinent Background</u>

  In or around October 2021, NorthMarq entered into a settlement agreement with KCSL and certain of KCSL's principals in their individual capacities.  (ECF No. 150 at 8 ¶ 26; ECF No. 158 at 8 ¶ 26; ECF No. 151-9 at 1 (the "KCSL Settlement Agreement").) Therein, KCSL agreed, among other things, to (1) pay NorthMarq a $300,000 lump sum payment and (2) transfer title to the Property to NorthMarq or its designated agent via a deed-in-lieu of foreclosure.  (ECF No. 150 at ¶ 26; ECF No. 151-9 at 2 ¶¶ 2–3.)

  NorthMarq and KCSL "expressly agreed that the Deed-in-Lieu shall not be in satisfaction of the indebtedness and other obligations owed to NorthMarq under the Building Loan Agreement [], but rather in exchange for the covenant not to sue provided in Section 9 below."  (*Id.* at 2 ¶ 3.)  In Section 9, NorthMarq

> fully and forever covenant[ed] not to sue [KCSL] for any personal liability for any and all claims . . . which have been or could have been brought pursuant to, or which arise out of, or are in any way connected with, the Project, the Contract, the Building Loan Agreement, the Loan Disbursement Agreement, the Property, the Bonds, or the Lawsuit (the 'NorthMarq Claims'); provided nothing herein shall prevent NorthMarq from initiating or prosecuting any public trustee foreclosure, Rule 120 action, replevin, or other

> judicial or non-judicial proceeding to foreclose on any Lien or
> otherwise realize upon any collateral given to secure the
> Obligations.  For the avoidance of doubt, the above
> covenant not to sue shall render the NorthMarq Claims to be
> nonrecourse as against the KCSL Non-Recourse Parties
> and [they] shall have no personal liability for the NorthMarq
> Claims.

(ECF No. 151-9 at 4 ¶ 9(a).)

The KCSL Settlement Agreement incorporated as Exhibit A an Agreement for

Deed-in-Lieu of Foreclosure ("DIL Agreement") between KCSL, NorthMarq, and KC I,

LLC ("KC I").  (*Id.* at 16.)  KC I is a single purpose entity formed by NorthMarq Capital,

LLC ("NorthMarq Capital").  (ECF No. 150 at 9 ¶ 29.)

The DIL Agreement recited that

> Grantor and Lender have entered into that certain
> Settlement Agreement, of even date herewith [] in which
> Grantor agreed to convey the Property to Lender's designee
> in consideration of Lender's agreement not to pursue
> Grantor for its personal liability for payment of the Secured
> Obligations.  Lender has designated Grantee [KC I] as its
> designee to take title to the Property.

(ECF No. 151-9 at 16.)  The DIL Agreement further prescribed that KCSL would

"execute and deliver to Grantee a special warranty deed in a form acceptable to Lender

[] conveying the Property to Grantee."  (*Id.* at 17.)  And, it warranted the following:

> **6.    Retention of Liens and Security Interests**.
> Notwithstanding any other provision in this Agreement to the
> contrary, Lender may proceed to foreclose or exercise any
> other remedy available by law or under the Deed of Trust to
> realize upon any of the collateral given to secure the
> Secured Obligations, including without limitation: (i) a
> foreclosure on the Property and (ii) the application of the
> balance of funds held in deposit accounts.  Lender shall
> retain the Deed of Trust and shall not be obligated to release
> the same.  The parties specifically and expressly do not
> intend the execution, delivery and recordation of the Deed to
> merge with the mortgage interest of Lender under the Deed
> of Trust into the fee simple interest granted by the Deed.  To

> the contrary, the lien of the Lender under the Deed of Trust
> shall expressly survive the execution, delivery and
> recordation of the Deed.

(*Id.* at 19 ¶ 6.)

As set forth in the DIL Agreement, KCSL did so convey the Property to KC I via a special warranty deed.  (ECF No. 150 at 9 ¶ 29; ECF No. 151-19 at 17 ¶ 2(a); ECF No. 150-9 (the "Special Warranty Deed").)  The Special Warranty Deed states, in pertinent part:

> THIS DEED IS AN ABSOLUTE CONVEYANCE, THE
> GRANTOR HAVING SOLD SAID PROPERTY TO THE
> GRANTEE FOR A FAIR AND ADEQUATE
> CONSIDERATION . . . BEING A RELEASE OF THE
> PERSONAL LIABILITY FOR OBLIGATIONS SECURED BY
> THE DEED OF TRUST DESCRIBED BELOW.
>
> It is the express intention of the Grantor and the Grantee that
> the [Deed of Trust] shall not merge with the fee ownership
> being acquired by the Grantee, but shall be and remain at all
> times separate and distinct.  The lien of the Deed of Trust
> and the fee ownership in the Property being conveyed
> hereby shall be and remain at all times separate estates and
> that the lien of the Deed of Trust shall remain a valid and
> continuous lien on the Property subject only to a written and
> recorded release thereof by the holder of the indebtedness
> secured thereby.

(ECF No. 150-9 at 1.)

NorthMarq has not assigned the Indebtedness or Deed of Trust to KC I, nor any other individual or entity.  (ECF No. 150 at 9 ¶ 32.)

2.    <u>Analysis</u>

Condition 10(b) of the Policy provides:

> **10.    REDUCTION OF INSURANCE; REDUCTION OR
> TERMINATION OF LIABILITY**
>
> . . .

> (b)    The voluntary satisfaction or release of the
> Insured Mortgage shall terminate all liability of the Company
> except as provided in Section 2 of these Conditions.

(ECF No. 149-6 at 7 ¶ 10(b).)  Fidelity argues that NorthMarq's claims "must be

dismissed" based on Condition 10(b) because "the Policy and NorthMarq's claim

terminated when NorthMarq discharged KSCL's obligation to repay the Note in

exchange for KCSL's conveyance of the Property . . . to NorthMarq's designee, KC I."

(ECF No. 150 at 14–15.)  NorthMarq's counters, first, that even if the Policy did

terminate in conjunction with the DIL Agreement, that termination would not extinguish

NorthMarq's *pre-existing* claim that it tendered to Fidelity a year prior to entering into the

KCSL Settlement Agreement.  (ECF No. 158 at 22.)  And second, NorthMarq argues

that the Insured Mortgage has not been released or satisfied, so the Policy has not

terminated in any case.  (*Id.* at 25.)

The Court agrees with NorthMarq's second argument, and it accordingly does

not reach the first.

In reaching the conclusion that the Insured Mortgage has not voluntarily been

satisfied or released, the Court is especially persuaded by *Federal Land Bank of

Wichita v. Colorado Nat. Bank of Denver,* 786 P.2d 514 (Colo. App. 1989).  There, a

land owner obtained a loan from the plaintiff, Land Bank, and, "in exchange, [the owner]

gave [] Land Bank both a promissory note and a mortgage on the ranch to secure

repayment of the obligation."  *Id.* at 515.  Several years later, the defendant, Colorado

National Bank, filed a judgment lien against the property, prompting the owner to

execute a deed in lieu of foreclosure to Land Bank.  *Id.*

On appeal from the trial court's finding that Land Bank held the first lien on the

property, Colorado National Bank argued "that the underlying debt was extinguished by

*payment, satisfaction, or release*, and that, therefore, the Land Bank's mortgage lien no longer had a debt to support it." *Id.* at 516 (emphasis added). The Colorado Court of Appeals disagreed. *Id.* It observed that "[t]he debt and the liability of the mortgagor for that debt are two distinct things." *Id.* Thus, "[a] mortgage lien is not discharged if it is the intention of the parties merely to release the mortgagor's personal liability for it and not to extinguish the debt." *Id.* Land Bank had represented that it would "cancel [the] Promissory Note" and "release [the property owner] from all personal liability" but expressly warranted "[t]here will be no merger of the security document for [the] loan into this conveyance." *Id.* Thus, the Court of Appeals concluded that the intended "effect was to release [the property owner] only from personal liability," while "the Land Bank's mortgage lien was not discharged." *Id.*

The Court of Appeals' reasoning in *Land Bank* similarly leads the Court to the conclusion that the DIL Agreement did not result in the "voluntary satisfaction or release of the Insured Mortgage." (ECF No. 149-6 at 7.) The KCSL Settlement Agreement, DIL Agreement, and Special Warranty Deed clearly convey NorthMarq's intent to release KCSL and its principals from *personal liability* for the Loan, while "the lien of the Deed of Trust shall remain a valid and continuous lien on the Property." (ECF No. 150-9 at 1.) Thus, the parties clearly intended that the Deed of Trust—that is, the "Insured Mortgage"—would not be extinguished.

The authorities cited by Fidelity do not persuade the Court otherwise, as none discuss the impact of a lender taking title to property via a deed in lieu of foreclosure that expressly conveys the parties' intent to preserve the mortgage lien. In *First Midwest Bank, N.A. v. Stewart Title Guaranty Company,* an Illinois court found that the

insured mortgage was satisfied when the lender consolidated the insured mortgage loan into a wraparound loan.  355 Ill. App. 3d 546, 554 (Ill. App. 2005) (taking note of, among other evidence, "letters that . . . [the lender] sent . . . show[ing] that the initial $300,000 loan had been paid in full and that the insured mortgage was released").  There is no such evidence that the loan has been paid in full and released here.

Fidelity also filed a Notice of Supplemental Authority (ECF No. 192) directing the Court to a recent decision of the Supreme Court of Arizona.  *See Centerpoint Mechanic Lien Claims, LLC v. Commonwealth Land Title Ins. Co.,* 569 P.3d 796 (Ariz. 2025).  In that case, the lender's "members sold their ownership interests . . . in amounts equal to the principal and interest owed on [the lender's] loan" but its deed of trust "was not released."  *Id.* at 800.  "The trial court reasoned that the [] loan was fully repaid, despite being termed 'a payment for partners' interests,' because (1) the purported purchase price was the exact amount of the loan, and (2) the payment 'was initially described as a 'payoff'' but was 'later changed to 'payment for partners' interests.'"  *Id.* at 801.  The trial court "concluded that the depiction of the transaction as a purchase of [the lender] rather than a loan payoff was a mere 'artful pretense.'"  *Id.*  And the Arizona Supreme Court agreed.  *Id.* at 805.  But there is no similar evidence here that the parties had shifting intentions as to the nature of the KCSL Settlement Agreement and whether it was intended to be a "loan payoff."  And the cash settlement payment made by KCSL certainly did not come close to the over $17 million loan balance that Fidelity acknowledges in its briefing.  (ECF No. 150 at 25.)  On these bases the Court easily distinguishes the decision in *Centerpoint Mechanic Lien Claims* on its facts, and declines to follow it.

By the same token, Fidelity also argues that NorthMarq is not entitled to any policy benefits or contractual damages insofar as Condition 8(a) provides:

### 8.    DETERMINATION AND EXTENT OF LIABILITY

. . .

(a)    The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)    the Amount of Insurance,

(ii)    the Indebtedness,

(iii)    the difference between the value of the Title as insured and the value of the Title subject to the risk Insured against by this policy . . . .

(ECF No. 149-6 at 7.)  Fidelity notes that "Indebtedness" is defined such that it "is reduced by the total of all payments and by any amount forgiven by an Insured."  (*Id.* at 5.)  However, Fidelity's argument as to Condition 8(a) rests on the same premise rejected by the Court above—namely, that "the Indebtedness here was extinguished when NorthMarq discharged KCSL's obligation to repay the amounts owed under the Note."  (ECF No. 150 at 25.)

Accordingly, Fidelity's Motion is denied to the extent it is based on the satisfaction or release of the Insured Mortgage under Condition 10(b) or NorthMarq's lack of damages under Condition 8(a).

### E.    Common Law Bad Faith

Finally, Fidelity seeks summary judgment on NorthMarq's common law bad faith claim.  (ECF No. 150 at 26.)  The Court discerns no argument warranting summary judgment in Fidelity's favor and will not dwell on this claim but addresses a few of Fidelity's arguments below.

First, Fidelity argues that, "[b]ecause Policy benefits are not owed to NorthMarq, there can be no bad faith." (*Id.*) The Court has concluded otherwise above, so it will not further analyze this argument.

In the same vein, Fidelity calls into question whether NorthMarq's bad faith claim can be based on its own reasonable expectations of coverage. (*Id.* at 28–29.) As the Court has now found at least partial coverage based on the plain language of the Endorsement, NorthMarq's claim to coverage is not grounded solely in its own reasonable expectations.

Finally, and perhaps most importantly, Fidelity argues that it is entitled to summary judgment based on its repeated assertion that "there is no evidence Fidelity engaged in unreasonable conduct causing NorthMarq any damage." (ECF No. 150 at 27.) This argument is belied by NorthMarq's expert's 186-page expert report outlining that "Fidelity acted contrary to applicable insurance industry standards in investigating, evaluating, and responding to the claim." (ECF No. 159-13 at 1); *see also Goodson v. Am. Standard Ins. Co. of Wisconsin,* 89 P.3d 409, 415 (Colo. 2004) ("The reasonableness of the insurer's conduct must be determined objectively, based on proof of industry standards. The aid of expert witnesses is often required in order to establish objective evidence of industry standards." (internal citations omitted)).

For at least these reasons, Fidelity's Motion is denied with regard to NorthMarq's common law bad faith claim.

### IV. CONCLUSION

For the reasons explained above, the ORDERS as follows:

1.      NorthMarq's Partial Motion for Summary Judgment (ECF No. 148) is

GRANTED IN PART and DENIED IN PART, as set forth above;

2.      Fidelity's Motion for Summary Judgment (ECF No. 150) is DENIED;

3.      The Court FINDS, as a matter of law, that:

a.      Fidelity had a duty to defend NorthMarq in the Lien Suits, which it breached by refusing to provide NorthMarq any defense; and

b.      Fidelity had a duty to indemnify NorthMarq for any loss or damage NorthMarq sustained by reason of the lack of priority of the Insured Mortgage over the Petra Lien, but only to the extent that the Petra Lien is based on work furnished *before* the Date of Coverage.

4.      Remaining for resolution at trial are the following issues and claims: (1) whether, notwithstanding the Court's findings as to the plain language of the Endorsement, NorthMarq is entitled to "full mechanics' lien coverage" under the reasonable expectations doctrine; (2) NorthMarq's common law bad faith claim; and (3) damages.

5.      This case REMAINS SET for a Final Trial Preparation Conference on October 9, 2025 at 2:30 PM and a seven-day Jury Trial to commence on November 3, 2025 at 8:30 AM, each in Courtroom A801.  (ECF No. 184.)

Dated this 30th day of July, 2025.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge